Miles Woodlief (SBN124467)
Archer™
775 East Blithedale Avenue
Suite 514
Mill Valley, California
phone: (415) 730-3032
facsimile:(415) 366-2956
Attorney for Debtor and Debtor-in-Possession

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
(Oakland Division)

| | |
|---|---|
| In Re:<br><br>Nutrition 53, Inc.<br><br>497 Edison Ct. Suite B<br>Fairfield, CA 94534<br><br>Employer's Tax Identification (EIN) No. : 30-0369583<br><br>Debtor | Chapter 11<br><br>Case No.: 4:23-bk-40997<br><br>**APPLICATION FOR ORDER AUTHORIZING DEBTOR TO ENTER INTO DISTRIBUTION AGREEMENT AND DECLARATION IN SUPPORT OF SAME** |

**APPLICATION FOR ORDER AUTHORIZING DEBTOR TO ENTER INTO DISTRIBUTION AGREEMENT**

Nutrition 53, Inc., Debtor and Debtor in Possession ("Debtor") predicate the relief it seeks in this Application on the following:

**Relief Sought**

Prior to its bankruptcy filing, Debtor faced a series of financial struggles in its operational efforts caused by the IRS' improper efforts to collect a third-party debt from Debtor. (Debtor is filing an objection to the IRS secured claim all but concurrently with this Application.)

Having filed its Chapter proceeding, Debtor is seeking to re-start its operations, regain market share and reestablish its reputation in its field. To that end, it seeks to enter into the


Case: 23-40997 Doc# 18-7 Filed: 08/16/23 Entered: 08/16/23 09:02:37 Page 1 of 16

attached Distribution Agreement ("Agreement").

The proposed agreement provides the Distributor a license to purchase N53 products directly from the manufacturer and distribute the items solely within a specific market. The Agreement requires no out-of-pocket costs be incurred by Debtor and pays to Debtor a percentage of Distributor's *gross* income.

This Agreement is likely an ordinary course transaction, with an additional component: a licensing agreement to facilitate the distributor's right to purchase Debtor's products directly from the manufacturer.

In an abundance of caution, Debtor submits this Agreement for approval.

**Legal Predicate**

Section 363(c) (1) of the Bankruptcy Code provides:

> If the business of the debtor is authorized to be operated under section ... 1108 ... of this title and unless the court orders otherwise, the trustee may enter into transactions ... in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.
>
> 11 U.S.C. § 363(c) (1) (1988) (emphasis added).[2] In contrast, a notice and hearing are required before the trustee (or debtor-in-possession) may use property of the estate other than in the ordinary course of business. 11 U.S.C. § 363(b) (1).

11 U.S.C. Section 363 is designed to strike [a] balance between a business continuing its ordinary operations without excessive oversight and protecting creditors' assets from dissipation. *See United States ex rel. Harrison v. Estate of Deutscher*, 115 B.R. 592, 599 (M.D.Tenn. 1990) Creditors are not given the right to notice and a hearing when transactions are in the ordinary course of business "because their objections to such transactions are likely to relate to the bankrupt's chapter 11 status, not the particular transactions themselves." *In re James A. Phillips, Inc.* 29 B.R. 391, 394 (S.D.N.Y. 1983).

Admittingly, neither the Bankruptcy Code nor its legislative history provides a framework for analyzing whether particular transactions are in the ordinary course of a debtor's business for the purpose of section 363. *In re Roth American, Inc.*, 975 F.2d 949, 952 (3d Cir. 1992). To determine whether this Agreement is in the ordinary course, courts generally apply a two-step inquiry: a "horizontal dimension" test and a "vertical dimension" test. *See* Benjamin Weintraub Alan N. Resnick, *The Meaning of "Ordinary Course of Business" Under the Bankruptcy Code — Vertical and Horizontal Analysis*, 19 UCC L.J. 364 (1987) ("Weintraub Resnick").

The horizontal inquiry is whether, the transaction is of the sort commonly undertaken by companies in that specific industry (a farmer growing crops vs. building widgets). *In re Waterfront Cos.* 56 B.R. 31, 35 (Bankr.D.Minn. 1985). The vertical inquiry analyzes the transactions from a creditor viewpoint, asking whether it subjects a creditor to economic risk other than reasonably expected when credit was extended (a car dealership financing $1,000 used cars vs. new Bentleys). *In re Johns-Manville Corp.,*60 B.R. 612, 616 (Bankr.S.D.N.Y. 1986)).

The primary focus of both is to compare the contemplated transaction with the Debtor's pre-petition business practices and conduct. *Weintraub Resnick*, 19 UCC L.J. at 366.

This Agreement provides no financial risk to a creditor as Debtor incurs no financial obligation. That said, in an abundance of caution, Debtor submits this Agreement to the Court for approval.

**Jurisdiction and Venue**

The United States Bankruptcy Court for the Northern District of California, Oakland Division (the "Court") has jurisdiction over this Application under 28 U.S.C. §§157 & 1334. This matter is a core proceeding within the meaning of 28 U.S.C. §157(b)(2), and the Court may

enter a final order consistent with Article III of the United States Constitution. Venue is proper in this District under 28 U.S.C. §§1408 & 1409.

**Conclusion**

Debtor requests that the Agreement be approved.

Dated: August 15, 2023

By: ___________________
Miles Archer Woodlief
Attorney at Law
775 East Blithedale Ave., #514
Mill Valley, CA 94941
phone: (415) 730-3032
facsimile:(415) 366-2956



Case: 23-40997 Doc# 18-7 Filed: 08/16/23 Entered: 08/16/23 09:02:37 Page 4 of 16

**Declaration of Kristine Manlapaz**

1. I am the CEO of Nutrition 53, Inc.. Except as otherwise indicated, I make this declaration on the basis of my own personal knowledge, and if I were called on as a witness, I could and would testify competently to the following facts:

2. Prior to its bankruptcy filing, Debtor faced a series of financial struggles in its operational efforts caused by the IRS' improper efforts to collect a third-party debt from Debtor. (Debtor is in the process of filing an objection to the IRS secured claim.)

3. Having filed its Chapter proceeding, Debtor is seeking to re-start its operations, regain market share and reestablish its reputation in its field. To that end, it seeks to enter into the attached Distribution Agreement ("Agreement").

4. The proposed agreement provides the Distributor a license to purchase N53 products directly from the manufacturer and distribute the purchased items solely within a specific market.

5. The Agreement requires no out-of-pocket costs be incurred by Debtor and pays to Debtor a percentage of Distributor's *gross* income.

6. I believe this Agreement is a transaction within Debtor's ordinary course, though it does includer a unique component: a licensing agreement intended to facilitate the distributor's right to purchase Debtor's products directly from the manufacturer.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge and belief. Executed at Alamo, California this 15th day of August, 2023.

Kristine Manlapaz

Exhibit A

**DISTRIBUTION AND LICENSE AGREEMENT**

This Distribution and License Agreement (this "Agreement") is made effective on August 14, 2023 (the "Effective Date") by and among, on the one hand, Nutrition 53, Inc. ("N53") and, on the other hand, Pro Performance Distribution, Inc. ( "Distributor"), N53 and Distributor shall together be referred to as the "Parties" and individually as a "Party."

**RECITALS**

**I. For purposes of this Agreement:**

A. The term "Products" means the following flavors of Lean1: vanilla, strawberry, chocolate, and chocolate peanut butter

B. The term "IP" means all trademarks, copyrights, design and utility patents, and all other proprietary information associated with the Products, together with all modifications, customizations, or updates thereof. IP does not include any marketing plan, marketing materials, or websites created by or at the direction of Distributor;

C. The term "Territory" means Amazon.com (all online channels at Amazon.com) and Lean1.com.

D. The term "Nutrition 53", on which N53 holds a valid trademark and tradename, means the name under which the Products have been commercialized in the Territory and worldwide by N53; and

E. The term "Net Sales" shall equal gross sales minus the cost of goods sold, shipping fees, taxes, levies, duties, insurance and returns.

**II. Subject to the terms and conditions set forth in this Agreement, the Parties wish to enter into this Agreement to satisfy the following:**

A. N53, inventor and exclusive owner of the Products and the IP, has been engaged in the designing, creation, manufacture, sale, and marketing of the Products throughout the world since year 2007.

B. Distributor desires to become N53's exclusive distributor in the Territory and be engaged in the sale, brand management, and marketing of the Products.

C. N53 and Distributor have agreed to enter into this Agreement and, under the terms of this Agreement, to grant Distributor the exclusive right and duties to market, distribute and commercialize the Products in or through the Territory as an N53 master distributor and licensee. N53 hereby represents that it has the right, power and authority to grant to Distributor all such rights and privileges without the requirement to obtain consent or approval from any person or entity.

D. Distributor and N53 have agreed to enter into this Agreement to provide Distributor the right and duty to (i) purchase the Products directly from the manufacturer of the same for sale within the Territory, and (ii) have an exclusive right and duties to market, distribute, and commercialize the Products within the Territory as distributor and licensee of N53. Distributor represents that it has full knowledge of the Territory, including without limitation, consumer trends and desires, applicable local laws and business practice therein, and it has fully and carefully evaluated the market, its legal framework in the Territory and decided that the Products are adequate and suitable for lawful and financially and economically feasible distribution within the Territory.

E. N53 and Distributor desire to actively collaborate to use their best efforts to facilitate the promotion and sales of Products in the Territory and to work toward common strategies and policies to best establish, build, and solidify the brand, market, distribution, reputation and good will of the Products, the Products name and their brands in the Territory.

In consideration of the foregoing premises and the mutual promises and covenants of the Parties, the Parties agree as follows:


Doc ID: 0bff9a6f38d469d842bc21117ad431ccd03e0b2b

1. **Appointment.**

1.1 Subject to Section 2.6, below, N53 hereby appoints Distributor as its exclusive distributor and exclusive licensee for the marketing, distribution, sale, promotion, advertising, and commercialization of Products within the Territory under the terms of this Agreement.

1.2 Distributor shall have the right of first offer for distribution in the Territory of all products developed by N53 or N53 and others jointly which are other than the Products and which other products are not covered under a license or distribution agreement with another distributor.

1.3 During the term of this Agreement, N53 shall not directly or indirectly sell or offer to sell any Products in the Territory to any third party, nor enter into any arrangement with any third party that would allow the third party to sell any Products in the Territory without the prior written consent by Distributor in each instance.

1.4 Subject to the terms of this Agreement, within the Territory, Distributor shall have the right to appoint sub-distributors, and shall, as soon as practicable upon such appointment, provide N53 with the name and identity of each sub-distributor appointed after the Effective Date. Except as may be provided by applicable law, and except to the extent that a claim is asserted against Distributor by or through a sub-distributor alleging any defect in, or harm caused by, the Products, N53 shall not carry any engagement or liability with or against, and has and shall have no contractual privity with, any sub-distributor appointed by Distributor.

1.5 Distributor shall provide in its sub-distribution agreements an obligation on the part of sub-distributors to refrain from any action that could reasonably be expected to cause damage to N53 and to Distributor. Upon receiving written notice that any such sub-distributor has undertaken the forgoing, Distributor shall take commercially reasonable steps to enforce the terms of the sub-distributor agreement.

1.6 Distributor shall not, and shall contractually obligate its sub-distributors not to (i) sell to or seek customers, sub-distributors or resellers for the Products outside the Territory; (ii) advertise the Productsoutside the Territory; (iii) canvass or solicit orders for the Products from purchasers outside the Territory, and (iv) upon learning that any such sub-distributor has undertaken any of the forgoing, shall take commercially reasonable steps to enforce the terms of the sub-distributor agreement.

1.7 Distributor shall have the right to terminate this Agreement at any time upon six (6) months' prior written notice to N53. Following the end of such six (6) month period, Distributor shall have the right to continue in a non-exclusive relationship with Distributor or to terminate this Agreement completely.

2. **Acceptance.**

2.1 By executing this Agreement, Distributor recognizes and acknowledges that N53 is the sole and rightful owner of the IP.

2.2 Subject to Section 2.6 below, Distributor commits to: (i) refrain from directly or indirectly manufacturing Products in or out the Territory; (ii) refrain from importing or exporting Products in or out the Territory except as necessary to deliver Products to customers who place orders in the Territory; (iii) buy Products exclusively from N53 or from N53's authorized manufacturers; (iv) actively market and promote the Products to appropriate potential sub-distributors, and customers in and through the Territory; (v) use standard of practice (in the online sales business) efforts, subject to restrictions imposed by Amazon and by the owner of the Lean1 website, to promote the sale of Products; and (vi) accurately advise potential sub-distributors and customers of the selection, innovation and functionality of the Products; (vii) keep N53 reasonably informed about conditions observed by, or brought to the attention of Distributor by written notice, that would reasonably be expected to affect the sale of the Products in the marketplace and conditions of Territory (demand for, customers satisfaction, promotion, strategy and concurrence from other companies, etc.).


Doc ID: 0bff9a6f38d469d842bc21117ad431ccd03e0b2b

2.3 Distributor may not sell and/or distribute any products in the Territory that directly complete with the Products in the Territory.

2.4 Except as set forth in Section 1.7 hereof, should this Agreement be terminated, then, to the extent permitted under applicable law, Distributor, in further consideration for the terms and conditions of this Agreement, undertakes and guarantees to refrain from selling or distributing any Products bearing the N53 name from anyone other than N53 for a period of one year and to have all sub-distributors agree to the same; provided, however, that Distributor and all sub-distributors shall have the right to sell out all of their inventories of Products, and retain all of the proceeds of such sales, following termination of this Agreement.

2.5 N53 and Distributor agree that Distributor shall create, develop, and execute a marketing and advertising plan of Distributor's own design, and at Distributor's own cost, to achieve Distributor's vision of a successful distribution, sales, and market of Products in Territory, including, at Distributor's option (without limitation) participating in trade shows. A summary of Distributor's marketing and advertising plan shall be annually provided to N53, subject to the confidentiality obligations of Section 19 and the express agreement of N53 that such plan shall not be provided beyond N53 C-level staff and N53's legal and accounting advisors without Distributor's prior written consent in each instance. N53 shall not have the right, power or authority to require Distributor to follow any particular marketing plan, nor to change, alter, or modify, any marketing plan created by Distributor.

2.6 The Parties understand and acknowledge that N53 intends to commence a proceeding under Title 11 of the United States Code in the Bankruptcy Court for the Northern District of California (the "Bankruptcy Court") roughly concurrent with the execution of this Agreement. Notwithstanding anything to the contrary set forth herein, this Agreement shall not go into effect, and neither Party shall have any obligations hereunder, unless and until the Bankruptcy Court enters an Order approving N53's entry into the Agreement, and if the Bankruptcy Court enters an Order disapproving N53's entry into this Agreement then this Agreement and all of the Parties' obligations hereunder shall immediately become null and void and have no further force or effect.

3. **License.**

3.1 N53 hereby grants to Distributor an exclusive, non-assignable (but sub-contractable), right and license within the Territory to use the Products name and all of the IP pertaining to the Products, including without limitation, trademarks, designs, and logos IP, in accordance with the terms and conditions of this Agreement in the ordinary course of Distributor's business and to market the Products under each Product's name. It is intended and understood by N53 that Distributor has the fullest use possible for all the IP, including, without limitation, the business names and marks of the Products, subject to the terms of this Agreement. Distributor's right to use the IP is restricted to use by Distributor for and in its business and within the Territory. Distributor may issue a sub-license for the IP only upon N53's prior written approval, such approval not to be unreasonably withheld, delayed or conditioned, and such sub-license to be subject to the relevant terms and conditions of the provisions of this Agreement. The foregoing provisions regarding sub-licensing shall not apply to sub-distribution arrangements made by Distributor; sub-distribution arrangements shall not be considered a sub-license. If and as needed, N53 shall execute the documents requested by Distributor to record the license in favor of Distributor of the IP related to the Products and shall put its best efforts in collaborating with the recording of such documents if requested by Distributor.. Distributor will undertake the costs of recording the license of the IP in its favor.

3.2 **Proprietary Rights.** N53 warrants to Distributor (and to all sub-distributors contracted by Distributor) that all N53 has sole, full, unencumbered, and unrestricted rights to the IP and the rights granted to Distributor pursuant to this Agreement. Distributor acknowledges and intends that all the IP (including any modifications, customizations, or updates thereof) are transferred to and shall remain the exclusive property of N53. Distributor will not knowingly take any action that jeopardizes N53's intellectual proprietary rights or acquire or attempt to acquire any rights in the Licensed IP (including any modifications, customizations, or updates thereof), except for all of the rights granted to Distributor under the terms of this Agreement. Distributor will not remove, change, or obliterate any copyright, confidential, or proprietary notices incorporated in, marked on, or fixed to the Licensed IP or documentation by N53.


Doc ID: 0bff9a6f38d469d842bc21117ad431ccd03e0b2b

4. **Use of Intellectual Property Rights and URLs.**

4.1 If Distributor becomes aware of the existence of any entity using any intellectual property or URLs associated with the Products, or selling, manufacturing, commercializing or distributing the same or in any other way copying the N53's brand or the Products "look and feel," or otherwise potentially infringing on the N53 intellectual property rights within the Territory, Distributor shall promptly notify and provide N53 with necessary information and evidence of such potential infringement. Distributor shall take commercially reasonable steps to ensure that a similar obligation is imposed upon each of its sub-distributors.

4.2 N53 shall and at its sole expense, pursue all reasonable and necessary legal actions or other means against any such entity using any N53 intellectual property rights or similar associated with the Products, or selling, manufacturing, commercializing, distributing any Product or copycat product or in any other way copying N53's brand or the Products "look and feel," or otherwise potentially infringing on IP within the Territory. Distributor shall offer its full cooperation in the prosecution of any such means and actions. N53 shall cover all of Distributor's expenses, if any, in rendering such cooperation.

4.3 Without prejudice to N53's commitments and obligations under paragraph 4.2; Distributor may -- if it deems it necessary and subject to reimbursement by N53, and after (i) notice to N53 of a violation within the scope of this paragraph, (ii) a failure of N53 to timely pursue reasonable and necessary legal actions or other means against the entity committing the violation (including, without limitation, by not commencing such actions or means or communicating in writing its reason for not doing so within five business days of such notice) and (iii) notice to N53 that it had failed to respond or that its response was inadequate, and a failure of N53 to respond to such notice -- but shall not be required to, pursue reasonable and necessary legal actions or other means against the entity committing the violation. A violation within the scope of this paragraph shall include, without limitation, using any N53 intellectual property rights or similar IP associated with the Products, or selling, manufacturing, commercializing, distributing any Product or product copycat or in any other way copying N53's brand or the Products "look and feel," or otherwise potentially infringing the licensed IP within the Territory and scope of rights granted in its favor under this Agreement.

5. **Pricing and Payment.**

5.1 Distributor shall at all times during the term of this Agreement be authorized to purchase the Products at a price which is not higher than the price available to N53. Distributor understands and acknowledges that the price of Products may increase from time to time based upon third party manufacturing cost increases or as otherwise agreed between the Parties.

5.2 Distributor shall have net 15-day payment terms on all licensing fees or other sums due to N53 under this Agreement. Distributor shall be solely responsible for determining purchase terms with the Product manufacturer.

5.3 As consideration of the terms and conditions set forth in this agreement, (i) Distributor shall receive (or retain, as applicable) 15% of all Net Sales of the Products in the Territory and N53 shall receive eighty-five percent (85%) of all Net Sales of Products in the Territory, payable to N53 on the 15th and 30th day of each month, or the immediately following business day during the term of this Agreement.

5.4 As further consideration, Distributor shall, at the reasonable but sole discretion of N53, be eligible to receive a five (5) to ten percent (10%) equity interest in N53 based on revenue and performance during the initial six-month term of this Agreement, to wit: Distributor shall be eligible to a 5% equity interest in N53 once Product sales reach a monthly revenue of $1M in the Territory and shall be eligible to a 10% equity interest in N53 once Product sales reach a monthly revenue of $2M in the Territory.

6. **Terms of Supply.**

6.1 Since all Products are shipped by the manufacturer directly to Amazon, Distributor is not in a

position to inspect the contents of the boxes shipped by the manufacturer before the Products are sold and delivered to purchasers. Distributor will advise the manufacturer and N53 of the quantities of Products returned by purchasers to Amazon claimed to be defective by the purchasers and of any quality or safety concerns expressed by purchasers.

6.2 Distributor and the Product manufacturer shall be solely responsive for the resolution of such disputes. N53 shall provide such assistance to Distributor as Distributor shall reasonably request in connection with Distributor's interactions with the Product manufacturer to resolve such disputes.

6.3 All invoices shall be issued pursuant to applicable law and shall include the complete number of the applicable Purchase Order.

7. **Taxes and Levies.** Except as otherwise provided in the corresponding Purchase Order, or as otherwise agreed with a manufacturer of a Product, Distributor shall bear all taxes, duties, levies, and other similar charges, imposed as a result of the provision of Products, or otherwise, and such items shall be deducted from Gross Sales in the computation of Net Sales.

8. **Purchase Orders.** The Parties agree that each purchase of Products shall be established in one or more Purchase Orders between Distributor and a Product manufacturer, containing such terms and conditions as shall be negotiated by Distributor and a Product manufacturer. Copies of Purchase Orders shall be delivered to N53.

9. **Intentionally Deleted.**

10. **Changes To Purchase Orders.** Changes to purchase order or payment terms for Product purchases shall be determined by Distributor and the Product manufacturer, with notice of the same to N53 as described in Article 8 above.

11. **Termination of Orders for Convenience.** Notice of the termination by Distributor of any purchase order shall be provided by Distributor to N53 monthly as described in Article 8 above.

12. **Delivery Terms, Title And Risk Of Loss.** Delivery Terms, Title And Risk Of Loss shall be agreed to by Distributor and each Product manufacturer, with concurrent notice of the same to be sent to N53. Distributor shall not accept any delivery terms in which the risk of loss affecting the quality of the Products is not borne by the manufacturer until the expiration date stated on each individual container of Products is not borne by the manufacturer. Further, Distributor shall not accept any delivery terms in which the risk of loss of damage to the Products for any reason not related to the quality of the Products is not borne by the manufacturer to the destination designated by Distributor unless the manufacturer confirms to Distributor, at the time Distributor's order to the manufacturer is confirmed, that delivery of the Products to the place designated by Distributor, is insured (the cost of such insurance and the decision of whether Distributor or the manufacturer bears the cost of such insurance, to be negotiated by Distributor and the manufacturer).

13. **Delivery receipt.** Together with the notices of purchase orders as described in Section 8 above, Distributor shall provide to N53 notice of deliveries received during said month.

14. **Warranty.** N53 warrants that the Products are free from defects in design and manufacture, are merchantable, and are fit for the purposes for which the Products are claimed to be effective by N53 or the manufacturer. N53 further warrants that N53 and the manufacturer carry separate product liability insurance policies, each in a single limit amount of not less than $5,000,000 (five million dollars) and that, for the entire term of this Agreement, Distributor shall be named as an additional insured under said policy or policies, without cost to Distributor.

15. **Compliance with Laws and Regulations.**

15.1 Distributor shall be responsible for complying with all applicable laws and regulations in connection with its activities and sales of Products, except as otherwise provided in this Agreement. N53 shall contract with all manufacturers of Products for such manufacturers to warrant compliance by such

manufacturers to comply with all applicable laws, rules and regulations and for all of N53's distributors and sub-distributors to be third party beneficiaries of the warranty by the manufacturers of such compliance.

15.2 N53 shall cause each manufacturer of Products to place any warning, maintenance and instruction decals and other information as required by law on the Products and to provide to Distributor such other required safety-related information all in the language that is in compliance with the legal requirements of each jurisdiction in the Territory.

15.3 Distributor shall obtain at its own expense all necessary permissions, consents, and licenses, if any are required, and pay all necessary taxes and other fees, to enable the Distributor to market, distribute and sell the Products in the Territory.

16. **Indemnity by Distributor.**

16.1 Distributor shall defend, indemnify and hold N53 harmless from and against any and all actions, claims, losses, liabilities, costs, expenses, including reasonable legal fees, and damages, caused by Distributor and/or its sub-distributors (to the extent Distributor is responsible for their misconduct as set forth in Section 1.6) to N53 and/or any third party, if such claim results from, arises out of or in connection with any negligent act or omission or intentional misconduct by Distributor and/or any sub-distributor (if and to the extent Distributor is responsible for this misconduct as set forth in Section 1.6) or any breach of the terms of this Agreement.

16.2 Distributor shall not make modifications to the Products and shall not apply or use attachments, accessories, or parts on the Products, unless N53 has approved such modifications, applications or uses in writing, in advance. Distributor will defend, indemnify, and hold the N53 harmless from any claims of any kind, including but not limited to injuries to persons or damage to property, and attorney fees, arising from any modifications BY DISTRIBUTOR to the Products.

17. **Indemnity by N53.**

17.1 N53 shall defend, indemnify and hold Distributor harmless from and against any and all actions, claims, losses, liabilities, costs, expenses, including reasonable legal fees, and damages, caused by N53 or any manufacturer of Products (to the extent N53 is responsible for the misconduct of a Manufacturer) to Distributor and/or any third party, if such claim results from, arises out of or in connection with any negligent act or omission or intentional misconduct by N53 or any breach of the terms of this Agreement.

18. **Terms and Termination.**

18.1 The term of this Agreement shall be six (6) months from the Effective Date of this Agreement, subject to renewal extensions with N53 approval.

18.2 This Agreement shall be terminable only in limited circumstances relating to theft, fraud, intentional violation of exclusive purchasing from N53's manufacturers, or direct sale of the Product outside of the Territory.

18.3 In the event N53 desires to terminate this Agreement for specified cause, N53 shall provide notice of same to Distributor. If Distributor does not consent to such termination, the Parties will then arbitrate pursuant to the procedures of Paragraph 22.1 in order to determine whether the termination was proper. If the termination for cause is found to be improper, N53 shall pay all arbitration expenses (including legal fees for both Parties). Such arbitration shall be confidential and during such arbitration the business transactions between the Parties will continue in due ordinary course.

19. **Confidentiality.** The Parties will treat this Agreement and the terms hereof as Confidential Information not to be disclosed to any third party except as necessary for performance hereunder and except to the extent that disclosure may be required by applicable laws or regulations, in which case the Party required to make such disclosure shall promptly inform the other prior to such disclosure in sufficient time to enable such other Party to make known any objections it may have to such disclosure.


Doc ID: 0bff9a6f38d469d842bc21117ad431ccd03e0b2b

The Party required to disclose Confidential Information concerning this Agreement to a third party in accordance with the previous sentence will take all reasonable steps to secure a protective order or otherwise assure that the Agreement will be withheld from the public record.

20. **Assignment.** Neither Party shall without the prior written consent of the other Party assign, transfer, charge, or deal in any other manner with this Agreement or its rights under it or part of it, or purport to do any of the same, nor sub-contract any or all of its obligations under this Agreement. Sub-distribution agreements, as described in this Agreement shall not be deemed to be assignments and are permitted as described in this Agreement.

21. **Cure Period**. Any Party's failure to perform or comply with any term, obligation, covenant, or condition contained in this Agreement if cured within ten (10) business days after the delivery of written notice ("Cure Notice") from the other Party of such failure shall not constitute a breach of this Agreement;

22. **Notices.** Any notice required to be given pursuant to this Agreement shall be in writing and shall be given by delivering it to the relevant Party as set forth in this Agreement. Any notice given according to the above procedure shall be deemed to have been given at the time of delivery (if delivered by email or by hand), the next business day if sent via overnight courier, and when received (if sent by post).

23. **Jurisdiction.**

23.1 Any claim or controversy relating to this Agreement shall be submitted to and finally determined by arbitration in Oakland, Calif. before a single arbitrator. The arbitrator shall be selected, and the arbitration shall be conducted, in accordance with the Comprehensive Arbitration Rules and Procedures of JAMS. The non-prevailing party (as determined by the arbitrator, in his or her sole discretion, with the arbitrator not being required to determine that any party is the prevailing or the non-prevailing party) shall bear all costs and attorneys' fees related to the arbitration. Notwithstanding the preceding binding arbitration provisions, the Parties shall have the right to proceed in any court of proper jurisdiction or by self-help to obtain any equitable remedies. Preservation of these remedies does not limit the power of an arbitrator to grant similar remedies.

23.2 This Agreement shall be governed in all respects by the laws of the State of California without regard to any provisions thereof relating to conflicts of laws.

24. **Entire Agreement.**

24.1 This Agreement constitutes the entire agreement between the Parties as to the subject matter it contains and supersedes all prior and contemporaneous agreements, representations, and understandings of the Parties. No supplement, modification or amendment of this Agreement is binding unless executed in writing by all the Parties. No waiver of any of the provision of the Agreement will constitute a waiver of any other provision, whether or not similar, nor will any waiver constitute a continuing waiver. No waiver is binding unless executed in writing by the Party making the waiver.

24.2 The Recitals of this Agreement shall have the same force and effect as text and terms hereof.

24.3 Cancellation, expiration or earlier termination of this Agreement shall not relieve Parties of obligations that by their nature should survive such cancellation, expiration or earlier termination, including without limitation, warranties, remedies, confidentiality (par. 19), and, to the extent valid under applicable law, non-competition (par. 2.4).

25. **Severability.**

25.1 If any section, paragraph, or portion of this Agreement is deemed by any court having lawful jurisdiction of the subject matter of this Agreement to be void, voidable or valid for any reason, this Agreement will be otherwise valid and enforceable as if the void, voidable, or invalid section, paragraph or portion of this Agreement had not been a part of the Agreement.


Doc ID: 0bff9a6f38d469d842bc21117ad431ccd03e0b2b

Signed by the Parties or their duly authorized representatives:

| | | |
|---|---|---|
| NUTRITION 53, INC.<br><br>By: | Date<br><br>08 / 12 / 2023 | Address<br>497 Edison Court Suite B,<br>Fairfield, CA 94507 |
| Name: Kristine Manlapaz<br>Title: CEO<br>**Distributor** | | Email: kristine@nutrition53.com |
| PRO PERFORMANCE DISTRIBUTION, INC.<br><br>By: J.D. Swartz<br>Name: J.D. Swartz<br>Title: CEO | Date<br><br>08 / 12 / 2023 | Address<br>40 Center St<br>San Rafael, CA 94901<br><br>Email:<br>jdswartz@properformancedistribution.com |

| | |
|---|---|
| **Title** | PPD-N53 Distribution Agreement FINAL |
| **File name** | PPD-N53 Distribution Agreement FINAL.pdf |
| **Document ID** | 0bff9a6f38d469d842bc21117ad431ccd03e0b2b |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document History

| | | |
|---|---|---|
| SENT | **08 / 12 / 2023**<br>09:23:53 UTC-7 | Sent for signature to Kristine Manlapaz (kristine@nutrition53.com) and J.D. Swartz (jdswartz@properformancedistribution.com) from jdswartz@hotmail.com<br>IP: 24.5.24.163 |
| VIEWED | **08 / 12 / 2023**<br>09:24:12 UTC-7 | Viewed by J.D. Swartz (jdswartz@properformancedistribution.com)<br>IP: 24.5.24.163 |
| SIGNED | **08 / 12 / 2023**<br>09:24:55 UTC-7 | Signed by J.D. Swartz (jdswartz@properformancedistribution.com)<br>IP: 24.5.24.163 |
| VIEWED | **08 / 12 / 2023**<br>09:35:53 UTC-7 | Viewed by Kristine Manlapaz (kristine@nutrition53.com)<br>IP: 67.169.87.200 |

| | |
|---|---|
| **Title** | PPD-N53 Distribution Agreement FINAL |
| **File name** | PPD-N53 Distribution Agreement FINAL.pdf |
| **Document ID** | 0bff9a6f38d469d842bc21117ad431ccd03e0b2b |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document History

| | | |
|---|---|---|
| SIGNED | **08 / 12 / 2023**<br>09:36:30 UTC-7 | Signed by Kristine Manlapaz (kristine@nutrition53.com)<br>IP: 67.169.87.200 |
| COMPLETED | **08 / 12 / 2023**<br>09:36:30 UTC-7 | The document has been completed. |

Powered by Dropbox Sign